Incorporated. Arguments not to receive 15 minutes per side. Mr. Rafferty for Drexel Chemical Company. Good morning, your honors. May it please the court, I'm Michael Rafferty. I'm here on behalf of Drexel Chemical Company from Memphis. I'd like to reserve five minutes for rebuttal. Your honors, the deal that Albaugh made with Drexel was a great deal for Albaugh. And there were at least four features to it that made it so. First of all, Albaugh was facing paying 100% of its costs associated with paying data compensation to Syngenta or Novartis at the time. This is in 1998. And it was also facing its own costs associated with an arbitration to determine what the amount of that cost would be. So they entered into this agreement with Drexel that immediately cut in half both of those costs. So instead of paying 100%, they were now paying 50% of two major items, the data compensation amount and the arbitration costs. This also gave them immediate access to the market. They had been trying to get their own registration for atrazine since at least July, and actually going back as early as January of 1998. But when they'd made their offer to pay to Novartis on July 20 of 1998, Novartis came back and said, well, you know, you didn't cite as much data as you should have, and you're going to owe us more money. And they started going back and forth. And it was obvious they were heading for arbitration. And so from July until November, they're dancing around with Novartis. They make a deal, and then they try to hire Drexel's interview with Novartis, or at the time, Siva Geigy in 1994. And it's at that point, Drexel's CEO or Drexel's owner called Mr. Albaugh and said, you know, I had a better idea. We're not going to let you use our lawyer, but we'll make a deal with you where we'll cut your costs in half. It'll benefit us, and it'll benefit you. In cutting those costs in half, though, the agreement explained, I think, that Albaugh would pay 50 percent of the costs of all future payments that Drexel makes to Novartis in the future as data compensation in order to maintain the registration. But that agreement didn't specifically mention arbitration, did it? Because I know that later on, that's one of the issues. No, Your Honor. It did not specifically identify arbitration. On the other hand, at that time, that's what triggered the whole thing, the whole arrangement, was that they were getting ready to go to arbitration, which is why they wanted to hire Drexel's lawyer. So the question there, and that's why the word cost is so important, that this court pointed out to us the last time we were here, or the first time. And that is that the costs, if it did not include arbitration, they wouldn't have needed to use the word cost in there. They would have just said the amount of the data compensation. But it says it's the cost of the payments for data compensation, future payments, made in order to maintain the registration. So by using the word cost, I submit to the court that that is a clear indication they knew that arbitration was at least a possibility. It's not an actual requirement. They could have negotiated this and not actually had an arbitration. But at that point, Allbaugh was definitely facing arbitration because that's why they were not contacting Jeff Liss, the lawyer that Drexel used in Washington, D.C. But to go back to the immediate access that they got, they signed this agreement December 7, 1998. They then imported 204,000 gallons of atrazine in that month. So they had been trying for months to get their own opposition from Novartis. By entering into this agreement with Drexel, they cut their costs in half and they got immediate access and they resolved an issue that was unquestionably there at that time. And that was, what was Novartis going to demand from Allbaugh to get into the market in December of 1998? Well, we know that in November, and they knew at the time, in November of 1994, a special review had been announced by the EPA. Novartis had done a tremendous amount of work in connection with that. They developed a lot of data. They had a lot of charges that they were going to expect and they notified Allbaugh of this in July of 1998 when they made their offer to pay and said, hey, there's a lot more to this than what you're thinking. Well, you know, you've made this argument. There's no question but that Allbaugh received a substantial benefit, as you've observed, from this deal. But, you know, you're making what sounds like an equitable argument here when we're looking at the contract language, which is a contract that largely Drexel drew up and had an opportunity to cover and to really set out everything that they wanted this contract to cover. So why are you suggesting that we should read things into the contract or draw inferences when Drexel didn't specifically put that in the contract? Well, to answer that question, Your Honor, I would take it as twofold. One is, of course, Judge Fahm says, well, under the facts that are presented here, both parties were drafters of this agreement. There were multiple versions of it that went back and forth. And he said, you know, I'm not going to construe it against one party or the other because they both obviously contributed to it, even though there's no testimony from the parties about specifics, but you can infer it from or draw conclusions based on the drafts that went back and forth. So as far as that goes, I would submit to the Court that it's not accurate to say this was drafted by Drexel. This was initially drafted by Drexel, but both parties contributed to it. And if there is any ambiguity, that's really the problem here. It's in the provision that was drafted by Albaugh. That's the paragraph 7, the termination provision that doesn't say what is the effect of termination. And that's what this case is all about. But to answer the question that you asked, though, Your Honor, and that is this equitable issue, if you look at what Mr. Albaugh testified his understanding was of what the agreement was, it's exactly what we say it is. What he says is, quote, we agreed to pay 50% of whatever Bob paid, Bob Schake being the owner of Drexel, while he, Drexel, was in the agreement. It's while Drexel was in the agreement. They did put the termination provision in there. Obviously, no one disputes that. But it's what was Drexel paying, and what was its obligation to pay, while this agreement was in effect. The agreement between Drexel and Albaugh, the agreement between, I mean, is that the agreement? Yes. Yes, Your Honor. And so it's, and Judge Fahm also made another important fact that I, finding a fact that I submit is contradictory to, or is not supportive of his ultimate conclusion of law. And that is, he made the point and found that Albaugh's rights under this agreement were entirely derivative of Drexel's rights and obligations. So if you look at whatever Drexel obligated itself to pay, Albaugh was obligated to pay half of it. There's no question that that's what the agreement says. If you look at the notes of their own president, you know, he puts down that it's half of Drexel's out-of-pocket plus 50% forward. That is a perfect summary of Paragraph 2, Your Honor, or actually, yes, Paragraph 2, which included the $750,000 down payment lump sum that was half of Drexel's data compensation payment in the 1994 arbitration and half of its costs associated to that. Because if you look at the 94 arbitration decision, it was, the amount of data compensation was $807,000 and some change. So clearly, $750,000 is not half of that. It's, half of that would be obviously $400,000 and then the other half was the cost of the arbitration itself. Are we talking about findings of fact or conclusions of law, what you're saying here? Both, Your Honor. The finding of fact on the derivative part is in the findings. Where Judge Fahm erred, I submit to the court, is in his conclusions of law, and it's from pages 39 through 41. This is a peculiar situation, isn't it, counsel? Because all the, the judge said the arguments of the parties and the rules of construction, et cetera, were of little help. To, right? That's correct, Your Honor. In as much as that was the case, the court seemed to really be deciding issues of fact. Where do you say, what do you say the court acted solely as a matter of law? What feature? Where, well, as solely as a matter of law, I would say it's on the derivative that there are, that Albaugh's rights and obligations were derivatives of Drexel's. That's a fact because that's in the agreement itself. And, but I would submit to the court that where Judge Fahm erred as a matter of law is in the conclusions because he concluded that, well. But in taking those facts, he came out for the wrong side. Exactly. Okay. Well, and in the wrong way. And I would submit to the court the way this court should look at it is how do you answer, how do you determine what his conclusion, his conclusion of law is because there's nothing that he refers to in either FIFRA or the record or of any testimony from anybody that says this is how you should come out here. He crafted this on his own. That's right. Thank you, Your Honor. We'll, we'll hear from you in your rebuttal. Thank you, Your Honor. Scott Long on behalf of Albaugh. The agreement was good for Drexel as well. Drexel received $750,000 at the inception payable over time that they otherwise would not have gotten if Albaugh had pursued its follow-on registration with Syngenta, which had abandoned. Drexel ignores the fact that it did, in fact, draft the original agreement. Nowhere in its appendix. They admit that. The counsel admits that. He says then, thereafter, each party contributed in different ways. And the relevant provision here, Your Honor, is paragraph 2 sub I that sets forth what $750,000. Drexel drafted that provision. There was no negotiation. There was no discussion regarding that provision. It was Drexel's language. The Tennessee courts have held that the drafter of a provision of a contract is held responsible for the ambiguous language, and unclear language that they put in a contract, even if the party's engaged in negotiation and drafting of other provisions of the contract. The fact of the matter is, if Drexel wanted to make clear that Albaugh was responsible for all data costs that Drexel obligated itself to Syngenta prior to the termination of the contract through a data call-in or otherwise, they should have said that. The fact of the matter is, they didn't. The rationale behind holding an ambiguous provision against the drafter of the agreement is that, everything else being equal, the drafter of that provision should have to bear the consequences of the unclear language it uses. But when we're looking at construction of a contract, we don't go down the contract provision by provision and say paragraph number 1 was jointly drafted or negotiated, but provision number 2 was drafted solely by Albaugh, and provision number 4 was drafted. We don't do that by Drexel. We look at the integrated contract, don't we? Well, I refer you back to the Tennessee State Court cases that I cited that do talk about provisions, and here I would say that it's not, if you take the termination provision, which Albaugh did add the second sentence to paragraph 7, I would submit that at the time that sentence was added, it said something to the effect of, after the payment of the $750,000, Albaugh also has the right to terminate the contract. The only obligation that Albaugh had, after the payment of the $750,000, was the payment obligation that's set forth in paragraph 2 sub I. So there's no other obligation that Albaugh has. The court found that both parties were drafters, did it not? Yes, they did. He did. So where's that leave that it's true against? I believe that the court erred in finding that Albaugh was a drafter of the provision of the agreement that set forth what its payment obligations were. Is that a finding of fact or a conclusion of law? That, Your Honor, is a conclusion of law. I believe based on the Tennessee... Well, you agree that Albaugh drafted the termination provision? Yes, Your Honor. The second sentence of paragraph 7. Okay. Yes, Your Honor. And if you look at the first sentence of paragraph 7, that has reference to future payments, that the contract can be terminated, and there are no future... Albaugh has any future payments if the confidential statement of formula is not approved. But at that time, there were two... Don't you think the court construed your provision against you and Drexel's provision against it? No, I don't. Because I think if you construe the payment provision, the obligation provision, to sub I against Drexel, then it should read, as Albaugh understood it through a testimony of its witnesses, that that provision meant that it was only responsible for payments that Drexel made while the agreement was in effect. And so if you... The court saw it differently. Yeah, the court saw it... We saw it one way, Drexel saw it another way, and the court saw it a third way. Well, I thought this case came up here before, and it got remanded. I thought it was remanded for findings of fact. It did, Your Honor. The ambiguity of the contract. It did, Your Honor. Issue of law to be determined, and the record, this court could have done it just as easily. So at least I get an inference that it was sent down to have a factual determination. It was, Your Honor. Originally, it was determined on summary judgment, a finding by the district court that the language was unambiguous, and this court found that it was ambiguous, and so it was sent back down for a trial. And that's where the extrinsic evidence came in regarding the fact that Drexel, the exchange of drafts of the agreement, the facts that Drexel negotiated, or rather drafted, paragraph two sub I, that there were no discussions or negotiations regarding that obligation. Now, during the eight years that the agreement was in force, did ALBA make any payments to Drexel, or was the big payment made after ALBA terminated the contract? There was the original $750,000 payment. It set forth the agreement payable over time. And then Drexel made what we've referred to as a prepayment due to its upcoming arbitration with Syngenta of $1.5 million, and they sent an invoice to ALBA for half of that amount. ALBA was considering getting out of the atrazine business at that time anyway, so it immediately terminated the agreement. The court found that that termination occurred after that payment had been made, and so ALBA paid an additional $750,000 plus interest based on that $1.5 million payment by Drexel to Syngenta. So Your Honors, we believe that the district court committed error as a matter of law by finding that both parties were drafters of the agreement. How is that a matter of law? That sounds like a matter of fact, doesn't it? Because he's saying, if you look at the findings of fact... It is factual information to arrive at that conclusion. Yes, Your Honor, and if you look at the facts, he said... He didn't consult any particular statute, or he knew the rules of construction, right? Is it a matter of law? Your Honor, in the findings of fact, he says that Drexel drafted that provision to Sub I that there were no discussions between the parties regarding that provision. And so we submit that for purposes of construing that agreement, for purposes of finding that the ambiguous language should be construed against the drafter, that he committed an error in finding that ALBA somehow drafted that language. We don't dispute that ALBA contributed to other provisions in the agreement, including the termination provision. In addition, Your Honor, the District Court found that other extrinsic evidence that was presented didn't shed any light on this. The regulatory relationship created between the parties by virtue of this agreement is something referred to as a supplemental distributor relationship. And as Mr. Rafferty referred to, under a supplemental distributor relationship, the supplemental distributor's rights and obligations are entirely derivative of the obligations of the follow-on registrant. The supplemental distributors do not have the regulatory rights or responsibilities of the follow-on registrant, so they have no obligation to pay data compensation costs or share in the costs of future data costs. Unless, of course, they enter into an agreement that they will do that. And here, ALBA specifically agreed to pay part of those data compensation costs, being fully aware, I think, that costs are incurred during a particular period when they may not be paid during that time. The payment might come later because you don't prepay the costs, do you? You pay. Well, Drexel did in this case. They prepaid $750,000, but there were other costs that were incurred during the life of the agreement. And Drexel got a bill later for those costs. Judge Donald, I would agree with you if the relevant provision stated costs of data payments or costs of data compensation, but the language states costs of future payments. ALBA understood that language to mean the amounts of future payments. But doesn't it say future payments made as data compensation? Yes. If it said costs of data compensation, we'd be having a different argument. But I think the fact that it says costs of payments, at least in ALBA's mind, and this is what they understood the agreement to mean, was that that costs of payments meant amount of payments. So only when a payment was made was their obligation triggered. Now, this isn't a typical supplemental distributor relationship, obviously, and the court heard testimony on this at the trial. Typically, you have a follow-on registrant who manufactures or formulates the product, and then they give it to the supplemental distributor who then puts it brand name and then pays a royalty to the follow-on registrant for being able to use the. . . If we follow your logic, doesn't that put ALBA in the potential, in the position basically to engage in mischief if we don't set the payment until after the payment has actually been made? Because ALBA could then, well, Drexel could. . . Well, there could be costs accumulated, and on the eve of getting the payment, I mean, getting the bill, ALBA could terminate and say, Drexel didn't pay during the life of the agreement. We have terminated, and so we don't owe this. That's not logical. I don't think so, Your Honor, because Drexel could. . . You don't think they could? You don't think that's the interpretation? Here, ALBA didn't get the invoice until after the $750,000 payment had already been made, terminated the next day, and the court held it responsible for half of that. So they've already been stuck for a million and a half plus interest. With respect to this, they haven't been in the Atrazine business now since 2006, and Drexel is still seeking to recoup additional monies from them. The supplemental distributor relationship, because ALBA had narrow rights and responsibilities, I would submit that if the converse were true, if this were an agreement between two follow-on registrants regarding the scope of their liability to each other for data costs or an agreement between an original registrant and a follow-on registrant where the follow-on registrant actually has regulatory responsibility for payment of data compensation costs, that that sort of extrinsic evidence should be taken into account in interpreting the language of the ambiguous agreement. Here, however, for whatever reason, Judge Fam, although recognizing that this was a supplemental distributor relationship and that ALBA has no obligation for data compensation costs as a supplemental distributor, failed to take into account the regulatory relationship between the parties. So that sounds more like an issue of law. I believe that's also an issue of law. To the extent you're discounting my... I'm saying. Yes, I believe that is an issue of law, Your Honor, that Judge Fam failed to consider that extrinsic evidence. The other issue is in the original draft of the agreement, there was a survivability provision where the payment obligation that became paragraph 2 sub I was going to survive the termination of the agreement up through what was then stated term of the agreement, the end of 2005. Now, I'd submit to you that if the... and the language of what that obligation was didn't change over time, that if the cost of future payment language really means, as Drexel asserts, all data compensation obligations incurred prior to termination, then a survivability provision really makes no sense. It's only if you consider that language to mean, as ALBA understood it, the amount of payments made, that then that obligation would survive regardless to the then stated term of the agreement that it makes sense. In fact, that survivability provision was negotiated out of the agreement, and I believe the court failed to take into account the fact that when you remove a provision that provides for the survival of certain obligations following termination, that that should be interpreted and construed in interpreting that agreement. Okay. So hypothetically, if generating studies in response to the two DCIs and the special review was required to maintain the atrazine registration during the time that the agreement was in force, would ALBA be liable to Drexel for the cost of those studies? I'm sorry. Could you... I'm sorry. Just... I said in the hypothetical, if generating studies in response to the two DCIs and the special review were required to maintain the atrazine registration during the time of the agreement, during the time the agreement was in force, would ALBA then be liable to Drexel for the cost of those studies if they were a requirement? No, Your Honor, because ALBA's requirement is set forth in what the agreement is, and ALBA's understanding and our interpretation of the obligation set forth in 2 III is that a payment is required. I realize I'm out of time, Your Honor, and I would just refer to my briefs on the other arguments submitted. We certainly have your briefs, and we'll review them for that purpose. So we'll hear from counsel. You have some time left, I think. Thank you, Your Honor. Your Honor, the first time we were up here, the question that Judge Cook asked was, when does this end? What ends when they terminate? And I would submit to the court that's still the question that we're trying to answer and that what this court needs to correct is what Judge Fahm... All the courts have said, you haven't helped much with that. He said that, but I would submit to the court that if you look at the experience of the people who testified, everybody had about 30 years, 25 years of experience, literally every witness on both sides. We had experts who testified on both sides. They can't tell you exactly, you know, A, B, C equals X. But there are a lot of Easter eggs in all of these materials that help reach the conclusion, and I would submit to the court it's an inescapable conclusion that what Albaugh's interpretation is couldn't possibly have been what their intention of the parties was in December of 1998 when they entered into this agreement because of the way FIFRA is constructed and because of the way data compensation is dealt with under FIFRA and what a DCI does. Because what the DCI does is it tells... The EPA tells the parties, the registrants, we want this data, and it puts this information out there and says this is what we want, and if you want to maintain your registration, you're going to have to produce this material to keep your registration in place, to maintain the registration, which was Drexel's contractual obligation to Albaugh. And to do that, you have to notify EPA how you're going to comply, how you're going to satisfy that DCI. There were two DCIs in this case, one in 2004 and one in 2005. Albaugh hadn't terminated their agreement at that point. Albaugh is a label. They have a registration for all of these atrazine-containing products. They got notice of the DCIs, so they know that their registration, maintaining their label and continuing their registration, is dependent on Drexel doing what it's supposed to do to comply with the DCI. So when Drexel made its offer to pay to Novartis back in 2004, I guess it was Syngenta, I'm not sure which one it was, but whichever one it was at that time, it solidified its commitment to satisfy those two DCIs. At that point, that's where it triggers the second part of the last paragraph or the last sentence of paragraph two, which is these are the costs of future payments. So the question then still comes back to, okay, well, we know that Drexel is still paying because Mr. Bernard testified at the trial that he was still getting invoices, and it was because it was satisfying the 2004 water monitoring data requirements in the 2004 DCI. So that question came up in the arbitration, and they issued a clarification, and I submit to the court this is a very important question of law that this court can look at and look at that clarification order because it addresses the very question that we're asked to deal with here, which is when does this end? And what Syngenta told the arbitration panel was this. This is the EPA's data call-in, and this is on page A in our appendix at 98. It's the clarification. It's attached to the clarification. We've had some success in getting some requirements waived. We try to make it as small a bread box as we can and meet EPA's needs to ascertain the continuing safety of the product, but we don't know when EPA is going to say no more of that. But some of the monitoring could continue for a while, and it will be what it is. And that's the best we can do. We know that the EPA will one day say this DCI is satisfied. We can't say when. But everybody has the same incentive, which is to cut it off at some point. Drexel, Syngenta, and ultimately All Ball as well. Your Honors, this is the cost of having done business. It's not the cost of doing business. This was a means to an end. That's why it was set up the way it was set up, and that's why it was so attractive to All Ball that they instantly terminated their application for their own registration and jumped in bed with Drexel and agreed to the deal that they did. The experts all agree it's perfectly legal but unique. How much do you think that they should have paid you? They should have paid half of what Drexel incurred. Five million or something else? The total amount, Your Honor, up through trial was $3,467,142.20, less the $750 that they paid. So they get credit for that. But then they also need to pay half of what Drexel continues to pay until that 2004 DCI is satisfied. How much does that figure? We can't speculate. What Syngenta told the arbitration panel was it will be what it will be. But there will be a termination to it at some point, but that termination is when EPA says it is satisfied by the monitoring that they've gotten up to that point. But I can't tell the court with any kind of certainty when that will be, other than that everybody has the same incentive, which is to get it to end. Thank you, Your Honor. No terminations. We will consider your case carefully and issue an opinion in due course. Thank you.